**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-064 RDM** |
| **v.** | : | |
| | : | |
| **CHRISTOPHER TAYLOR,** | : | |
| | : | |
| | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Christopher Taylor to 14 days of imprisonment, one year of supervised release, and 60 hours of community service.   The government also requests, consistent with the plea agreement in this case, $500 in restitution.

### I.    Introduction

Defendant Christopher Taylor, a 41-year-old Amtrak track foreman and former enlisted member of the Air Force, participated in the January 6, 2021 attack on the United States Capitol— a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Taylor pleaded guilty to violating 18 U.S.C. § 1752(a)(1). The government's recommendation is supported by (1) Taylor's entry into the Capitol through the Senate Wing Door 12 minutes after the Capitol was first breached, despite an alarm going off; (2) the recording of his entry, despite the chaos unfolding around him; and (3) his time on the West Front, continuing to oversee the disruption of the day.

The Court must also consider that Taylor's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Taylor's crime support a sentence of 14 days of imprisonment, one year of supervised release, and 60 hours of community service.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. See ECF No. 1.

*Defendant Taylor's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, the defendant traveled from his home in Levittown, PA to Washington, D.C. At some point prior to 2:23 p.m., Taylor breached the restricted perimeter of the Capitol. After breaching the perimeter, Taylor stood on the West Lawn of the Capitol with throngs of other rioters. *See* Image 1 below (Taylor circled in yellow). Taylor was wearing a camouflage hat, grey

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

jacket, and carried a blue backpack.  From his vantage point, Taylor heard the crowd chant "Fight

for Trump" and observed police officers attempting to hold the crowd at bay.

*Image 1:  Taylor on West Lawn of Capitol after breaching the restricted perimeter*



As depicted in Images 2 and 3 below, Taylor moved closer to the Capitol building and eventually made his way to the Northwest Courtyard. While in that area, Taylor heard rioters chanting, "This is our house," and observed Capitol Police Officers, dressed in riot gear, standing guard outside the Parliamentarian's Door, which would eventually be breached by other rioters at 2:42 p.m.

*Images 2 and 3: Open-Source Screenshots of Taylor in the Northwest Courtyard*





Taylor entered the Capitol at 2:23 p.m. through the Senate Wing Door (the Senate Wing Door is pictured in the center of Image 3, above). The Capitol building had been breached only 12 minutes earlier, when a rioter smashed a window next to the Senate Wing Door. Taylor's entrance was captured on both CCTV (Image 4 below) and open-source video (Image 5 below). On his approach to that doorway, Taylor would have observed other rioters climbing through windows that had been breached shortly before Taylor entered the Capitol. As he got closer to

the door, he would have observed its pane glass was also shattered.  Once inside, he would have

seen broken glass and debris on the ground.

*Image 4:  CCTV Screenshot of Taylor Entering Capitol Through Senate Wing Door at 2:23 pm.*



*Image 5:  Open-Source Video Screenshot of Taylor Entering Capitol at 2:23 p.m.*



Undeterred, Taylor moved further inside the building.  Soon after entering, Taylor turned left and proceeded north toward a hallway.  During this period, he continued to photograph and videotape himself inside the building.

*Images 6 and 7: Open-Source Screenshots of Taylor*
*Photographing/Filming Inside Senate Wing Hallway*





Taylor then proceeded down the hallway, heading in the direction of the North Door.

*Image 8: Open-Source Video Screenshot of Taylor*
*Proceeding Down Hallway in Senate Wing*



Taylor exited the Capitol through the North Door at 2:34 p.m., having spent 11 minutes inside the building.

*Image 9: CCTV Screenshot of Taylor Exiting Capitol at 2:34 p.m.*



*The Charges and Plea Agreement*

On February 6, 2024, the United States charged Taylor by a four-count Information for violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds);

18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). ECF No. 9. On August 14, 2024, pursuant to a plea agreement, Taylor pleaded guilty to Count 1 of the Information. By plea agreement, the Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Taylor now faces a sentencing for violating 18 U.S.C. 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year imprisonment and a fine of up to $100,000. Taylor must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 29-36.

U.S.S.G. § 4C1.1 provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.   While the Government concedes that Section 4C1.1 applies to Taylor, the Court should vary upward by two levels to account for the reduction under § 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioter contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").  Thus Taylor's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available

at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").The U.S. Probation Office calculated Taylor's criminal history as a category I. PSR at ¶ 83.  Accordingly, the U.S. Probation Office calculated Taylor's total adjusted offense level, after acceptance, at 2, and his corresponding Guidelines imprisonment range at 0 to 6 months. PSR at ¶¶ 38, 83.   Taylor's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the

Section 3553(a) factors weigh in favor of a sentence of 14 days of incarceration and one year of supervised release.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Taylor's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Taylor, the absence of violent or destructive acts is not a mitigating factor. Had Taylor engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Taylor's case is his presence on the Capitol's West Front prior to his entry into the building, during which he would have observed mayhem unfold in front of him.  He would have observed police officers' attempts to stem the tide of rioters from progressing toward the building, and heard fellow rioters chanting as they moved forward.  Having observed the riot take shape, Taylor faced a decision: turn back or move forward.  He chose the latter, which provides ample support for the Government sentencing recommendation.

Likewise, Taylor's entry through the Senate Wing Door approximately 10 minutes after the Capitol building was first breached supports the recommended sentence.  By design, that door sounded an alarm once opened, an unmistakable signal to all those within earshot that entry was not permitted.  Taylor undoubtedly heard that alarm – it would have been impossible for anyone

entering not to – and his decision to continue forward is an aggravating factor that this Court can and should factor in tailoring its sentence.

Further, Taylor documented his entry into the building by photographing and videotaping the instant he broke into the Capitol. By doing so, Taylor announced the subjective significance he placed on his actions. To Taylor, this was a moment worth memorializing, and the fact that he so savored his illegal action is an aggravating factor supporting that Government's sentencing recommendation. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 14 days' incarceration, one year of supervised release, and 60 hours community service.

**B. Taylor's History and Characteristics**

The most notable aspect of Taylor's history is his six-year descent into narcotics addiction that lasted from 2005 to 2011. PSR at ¶ 60. While Taylor reports that he ceased using controlled substances in 2011 (PSR at ¶ 61), his choice to use drugs left a lasting impact on his life. He served in the Air Force from 2002 to 2005, and that service came to an end because of his marijuana and barbiturate use. PSR at ¶ 65. It was during this period of his life that Taylor picked up his only criminal charge, a military drug-related arrest that resulted in what the PSR describes as a "non-judicial disciplinary action." PSR at ¶ 43. While the PSR reports that he was subsequently discharged under "honorable conditions," the circumstances that brought his military career to a premature end speak to poor choices his has made in his adult life. *Id*.

Aside from his drug use, the remainder of Taylor's history and characteristics is unremarkable. While his biological father was absent most of his life, he was raised by his mother and stepfather who provided his necessities in and environment that was free from abuse, neglect,

and violence.  PSR at ¶ 49.  While his childhood was not steeped in privilege, he certainly experienced nothing that would provide a mitigating factor for this Court to consider.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence also weighs in favor of the Government's recommended sentence.

Most importantly, Taylor has shown, at best, only tepid remorse for his actions. Taylor provided the PSR writer a one-sentence statement in which indicated that he "take[s] full responsibility for entering the Capitol," however he said nothing further to denounce his actions. PSR at ¶ 28. Thus, the Court should view any remorse expressed at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Taylor based on his own

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Taylor has pleaded guilty to Count One of the Information, charging a violation of 18 U.A.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Ruben Reyna*, 23-cr-350 (CKK), the defendant spent one minute inside the Capitol, 10 fewer than Taylor. Like Taylor, Reyna approached the Capitol from the west side and observed the chaos unfolding outside the building. And, like Taylor, Reyna entered the Capitol despite knowing that entry was unauthorized. Immediately after January 6, Reyna used social medial to blame the police and ANTIFA for any violence, and, in a later interview with the FBI, initially downplayed his conduct on January 6. Although Taylor did not engage in similar aggravating conduct, Taylor spent more time inside the Capitol and, like Reyna, Taylor has failed to show genuine remorse. Reyna pled guilty to violating 18 U.S.C. § 1752(a)(1), and Judge Kollar-Kotelly sentenced him to 14 days of incarceration to be followed by 12 months of supervised release. Given the similarities in Reyna's and Taylor's conduct and lack of genuine remorse, a similar sentence is warranted here. In *United States v. Michale McCormick,* 21-cr-710 (TSC),

similarly to Taylor, the defendant spent 8 minutes inside the Capitol after entering the building through the Senate Wing Door. Like Taylor, McCormick recorded his time inside the Capitol and failed to express remorse for his conduct. After the FBI contacted him, McCormick deleted the pictures and videos he took on January 6. McCormick pled guilty to Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). For his conduct, Judge Chutkan sentenced McCormick to 14 days of incarceration. A sentence of 14 days of incarceration is likewise warranted here.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Taylor must pay $500 in restitution, which reflects in part the role Taylor played in the riot on January 6.[4] Plea Agreement at ¶ 10.  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Taylor's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

## VI.    Fine

The defendant's convictions for violations of 18 U.S.C. § 1752(a)(1) subject him to a statutory maximum fine of $100,000.00 *See* 18 U.S.C. § 3571(b). In determining whether to

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $200 to $9,500. U.S.S.G. § 5E1.2(c).

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 14 days of incarceration, one year of supervised release, and 60 hours of community service. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Taylor's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      s/ *Jack E. Burkhead*
Assistant United States Attorney
201 Third St.; Suite 900
Albuquerque, New Mexico 87103

jack.e.burkhead@usdoj.gov
NM Bar No. 10493